UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KAREN SEABERG,

                Plaintiff,

-vs-                                  Case No. 5:13-cv-634-Oc-PRL

STEAK N' SHAKE OPERATIONS, INC.,

                Defendant.
_____/

## ORDER DENYING DEFENDANT'S
## MOTION FOR JUDGMENT AS A MATTER OF LAW,
## FOR NEW TRIAL, AND FOR REMITTITUR

This diversity jurisdiction Florida common law negligence action was tried to a jury and resulted in a verdict awarding damages to the Plaintiff.  The case is now before the Court on Defendant Steak N' Shake Operations, Inc.'s ("Steak N' Shake") post-trial Renewed Motion for Judgment as a Matter of Law or, Alternatively, For New Trial, or Alternatively for Remittitur (Doc. 57).  Plaintiff Karen Seaberg has filed a timely response (Doc. 61), and the motion is now ripe for disposition.

Upon due consideration, the Court finds that the Defendant's motion is due to be denied in part as to the motion for remittitur, and denied in all other respects.

## **Background and Procedural History**

Ms. Seaberg filed a single claim of common law negligence, alleging that she was injured when she slipped and fell on the premises of a Steak N' Shake store located in Ocala, Florida (Doc. 1).  Ms. Seaberg contended that a hazardous and/or dangerous condition existed at the store in the form of mayonnaise on the floor of the dining room, that Steak N' Shake knew or should have known of the dangerous condition, and that Steak N' Shake created and/or failed to warn Ms. Seaberg of the dangerous condition, resulting in her falling and suffering physical injury.

The case proceeded to trial on February 9-11, 2015.  At the conclusion of Ms. Seaberg's case in chief, Steak N' Shake orally moved for judgment as a matter of law.  See Docs. 45, 54.  The motion raised two issues:  (1) that Ms. Seaberg's legal status at the time of her injury was that of an uninvited licensee, as opposed to an invitee, thereby resulting in a lower duty of care on the part of Steak N' Shake; and (2) that Ms. Seaberg failed to show by a preponderance of the evidence that Steak N' Shake possessed actual or constructive knowledge of the presence of a foreign transitory substance on the floor at the time of Ms. Seaberg's fall.  The Court denied Steak N' Shake's oral motion in its entirety. See Docs. 45, 54.

On February 11, 2015, the jury returned its verdict (Doc. 48), in the form of responses to specific interrogatories, finding in favor of Ms. Seaberg.  More specifically, the jury found, from a preponderance of the evidence that:  (1) Steak N' Shake had actual or

constructive knowledge of a dangerous condition caused by the presence of a transitory foreign substance on the floor of its business establishment; (2) Steak N' Shake was negligent by failing to exercise reasonable care in taking action to remedy that condition; (3) Ms. Seaberg slipped and fell on the floor of Steak N' Shake's business establishment; and (4) Steak N' Shake's negligence was a legal cause of Ms. Seaberg's fall and resulting injury. (Id.). The jury then awarded to Ms. Seaberg $375,000 in past and future medical expenses and $50,000 in compensatory damages for pain and suffering. (Id.). Judgment was entered accordingly on February 11, 2015 (Doc. 51).

Steak N' Shake's renewed motion for judgment as a matter of law (Doc. 57) reasserts the same two arguments raised in its oral motion – namely that the legal status of Ms. Seaberg at the time of her injury was that of an uninvited licensee, and that Ms. Seaberg did not meet her burden of establishing that Steak N' Shake had actual or constructive knowledge of a substance on the floor prior to Ms. Seberg's fall. Alternatively, Steak N' Shake moves for a new trial under Fed. R. Civ. P. 59, arguing that: (1) the jury verdict is against the manifest weight of the evidence; (2) the Court committed a prejudicial error of law by holding that the common law legal status of an uninvited licensee is not part of Florida law; (3) the Plaintiff introduced error during rebuttal closing argument; and (4) the Court erroneously failed to instruct the jury on the affirmative defense of comparative negligence. Steak N' Shake also argues for a remittitur of damages, complaining that the jury's award is excessive and not supported by the evidence presented at trial.

Ms. Seaberg has filed a response in opposition (Doc. 61), and has also filed a motion for taxation of costs (Doc. 58), as well as a motion to add a party defendant to the final judgment (Doc. 59).  The Court will consider each motion seriatim.

**The Rule 50(b) Motion for Judgment As a Matter of Law**

**I.    Standard of Review**

The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is the same as the standard for granting a pre-verdict motion under Rule 50(a). Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 724 (11th Cir. 2012) (citations omitted).  Thus, under Rule 50, a "district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for [plaintiff] on a material element of [plaintiff's] cause of action." Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005) (citations omitted).  Stated differently, a district court should grant a Rule 50(b) motion "only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001).  The Court "must review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party." Walker v. NationsBank of Fla., N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).  "When a court considers a motion for judgment as a matter of law – even after the jury has rendered a verdict – only the sufficiency of the evidence matters.  The jury's findings are irrelevant." Connelly v. Metropolitan Atlanta

Rapid Transit Authority, 764 F.3d 1358, 1363 (11th Cir. 2014) (quoting Hubbard, 688 F.3d at 716).

## II.    Steak N' Shake's Knowledge

Florida Statute 768.0755 provides, in relevant part, that:

(1) If a person slips and falls on a transitory foreign substance in a business establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it.  Constructive knowledge may be proven by circumstantial evidence showing that:

(a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or

(b) The condition occurred with regularity and was therefore foreseeable.

Thus, in order to prevail, Ms. Seaberg had to present to the jury sufficient evidence to establish by a preponderance of the evidence that Steak N' Shake had actual or constructive knowledge that a dangerous condition existed at the store's premises – in this case either mayonnaise or some other substance on the dining room floor.

At trial, video surveillance footage from Steak N' Shake's interior premises on the day of Ms. Seaberg's fall was entered into evidence.  The video footage showed a server walking away from the dining room toward the front of the restaurant, carrying a tray of what appeared to be dirty dishes.  As she rounded the corner, an object resembling a souffle cup fell from her tray onto the floor.  The cup landed to the right of the hostess stand, at the approximate halfway point between the entry door and the front counter.

When the server became aware that something had fallen from her tray, she turned around, knelt, and picked it up. Approximately two minutes after the souffle cup had fallen, Ms. Seaberg entered the premises and fell.

In addition to the surveillance video, Ms. Seaberg presented three witnesses, each of whom testified about her fall. First, Ms. Seaberg herself testified that she slipped and fell on a substance that she believed to be mayonnaise. She never saw the spilled souffle cup shown on the video surveillance, and claimed that the spillage shown on the video did not cause her fall. Rather, Ms. Seaberg testified that she saw another server named Deborah Cole spill a souffle cup full of mayonnaise and that was what Ms. Seaberg slipped on. However, Ms. Seaberg also testified that she did not personally observe the substance in this second spillage so she could not confirm that it was in fact mayonnaise.[1]

Ms. Cole, a former Steak N' Shake employee, also testified, and admitted that she dropped a souffle cup on the day Ms. Seaberg fell. Ms. Cole believed that when she dropped the souffle cup, ranch dressing spilled onto the floor near the front door. She also testified that when such substances spill onto the floor they usually splatter. Ms. Cole further testified that she cleaned up her spill with a napkin, then mopped the area, put up a "wet floor" sign, and tried to warn Ms. Seaberg as she walked into the restaurant.

---

[1]There was some confusion in the evidence, highlighted by Ms. Seaberg's own testimony, that there were actually two spillages of either mayonnaise or ranch dressing that occurred at about the same time before Ms. Seaberg's fall. Either way, however, the result is the same. There was no confusion that Ms. Seaberg slipped and fell, and that the cause of her fall was the presence of a slippery foreign substance on the floor.

Lastly, Heather Seaberg, Ms. Seaberg's daughter and a then-employee at the Steak N' Shake restaurant, testified that after her mother fell, Heather personally observed mayonnaise smeared across the floor in the area where her mother fell.  Heather further testified that while employed by Steak N' Shake, she witnessed various spillages of foreign substances, and that those substances splattered on the floor.  She also explained that Steak N' Shake's policy is to place a chair or a "caution" sign over the spillage area and for an employee to remain by the spill until it is cleaned up.

The Court concludes, particularly when viewed in the light most favorable to Ms. Seaberg, that this evidence was more than enough to support the jury's finding that Steak N' Shake was negligent.  Ms Seaberg presented both video evidence and witness testimony from which the jury could reasonably infer that at least one Steak N' Shake employee was actually and/or constructively aware that a souffle cup with some transitory substance in it had spilled onto the floor, and that Ms. Seaberg slipped on this substance.[2] Stated differently, the evidence presented at trial was not "so overwhelmingly in favor of [Steak N' Shake] that a reasonable jury could not arrive at a contrary verdict." Middlebrooks, 256 F.3d at 1246.[3]

---

[2]There is no dispute that actual knowledge by an employee can be imputed to Steak N' Shake for purposes of establishing liability.

[3]Steak N' Shake's reliance on Walker v. Winn Dixie Stores, Inc., 160 So. 2d 909 (Fla. 1st Dist. Ct. App. 2014) and Gaidymowicz v. Winn-Dixie Stores, Inc., 371 So. 2d 212 (Fla. 3rd Dist. Ct. App. 1979) is unpersuasive.  In both of these cases, there was either no evidence that anyone was aware of any substances on the floor before the plaintiffs fell, or the defendant was made aware of the substance only one minute prior to the plaintiff's injury.  In this case, however, (continued...)

Steak N' Shake's renewed motion for judgment as a matter of law will be denied as to the issue of actual or constructive knowledge.

### III.   Ms. Seaberg's Legal Status

Steak N' Shake next argues that at the time of Ms. Seaberg's injury, she was an uninvited licensee on Steak N' Shake's business premises, and, as such, Steak N' Shake had a lesser duty of care to Ms. Seaberg, which was not breached.  Where the essential material facts are not in dispute (and they are not in this case) the legal status of the person injured on the business premises is a question of law for the Court.  See Wood v. Camp, 284 So. 2d 691, 696 (Fla. 1973); Barrio v City of Miami Beach, 698 So. 2d 1241 (Fla. 3d DCA 1997).

The historical common law of Florida with respect to premises liability established three separate legal categories for persons visiting the premises:  invitee, licensee, or trespasser.  An invitee, and for the purposes of this case, a business invitee, is defined as "one who enters upon the premises of another for purposes connected with the business of the owner or occupant of the premises."  Post v. Lunney, 261 So. 2d 146, 148 (Fla. 1972) (quoting City of Boca Raton v. Mattef, 91 So. 2d 644, 648 (Fla. 1956)).  A licensee is "one who enters upon the property of another for his own convenience, pleasure, or

---

[3](...continued)
evidence was presented of at least one employee dropping a souffle cup that contained an unspecified amount of a transitory substance, that the employee attempted to clean up the substance prior to Ms. Seaberg's fall, and two witnesses (Deborah Cole and Heather Seaberg) testified that a substance was on the floor immediately before and after Ms. Seaberg's fall.

benefit." <u>Post</u>, 261 So. 2d at 147 (quoting <u>Stewart v. Texas Co.</u>, 67 So. 2d 653, 654 (Fla. 1953). More specifically, an "uninvited licensee" is a person who chooses "to come upon the premises solely for his own convenience without invitation either expressed or reasonably implied under the circumstances." <u>Wood v. Camp</u>, 284 So. 2d 691, 695 (Fla. 1973). The third category of legal status - trespasser - is very similar to that of an uninvited licensee, and is defined as "one who enters the premises of another without license, invitation, or other right, and intrudes for some definite purpose of his own, or at his convenience, or merely as an idler with no apparent purpose, other than perhaps to satisfy his curiosity." <u>Post</u>, 261 So. 2d at 147.

The Florida legislature has also defined a trespasser as "a person who enters real property without invitation, either express or implied." Fla. Stat. § 768.075. This statute, entitled "Immunity from liability for injury to trespassers on real property," further defines an "invitation" as "the visitor entering the premises has an objectively reasonable belief that he or she has been invited or is otherwise welcome on that portion of the real property where injury occurs." Fla. Stat. § 768.075(e)(a)1. The statute also separates trespassers into "discovered trespassers" (those whose actual physical presence was detected by the property owner within 24 hours preceding the accident); and "undiscovered trespassers" (those whose actual physical presence was not detected by the property owner within 24 hours preceding the accident). Fla. Stat. § 768.075(e)(a)2.-3.

Among these various categories of potential claimants, a business or property owner owes the highest duty of care to a business invitee: (1) a duty to use reasonable care in

keeping and maintaining premises in a reasonably safe manner; and (2) a duty to warn of concealed perils that are known, or should be known to the property owner, and which are unknown to the invitee and cannot be discovered through the exercise of due care.  Krol v. City of Orlando, 778 So. 2d 490 (Fla. 5th DCA 2001).  The property owner owes a lesser duty of care to uninvited licensees: (1) a duty to avoid willful or wanton harm, and (2) to warn the licensee of known dangers that would not be open to the ordinary observation of the licensee.  Barrio, 698 So. 2d at 1241; Lane v. Estate of Morton, 687 So. 2d 53, 54 (Fla. 3d DCA 1997).   The lowest level of care applies to trespassers.  A property owner "must refrain from gross negligence or intentional misconduct that proximately causes injury to the discovered trespasser."  Fla. Stat. § 768.075(3)(a)3.(b).  With respect to undiscovered trespassers, the property owner merely "must refrain from intentional misconduct that proximately causes injury to the undiscovered trespasser."  Id.

Until 2010, the Florida Legislature also set out the burden of proof in a premises liability case involving transitory foreign objects or substances.  This statute, Fla. Stat. § 768.0710, expressly applied only to business invitees, and stated that a business owner owed "a duty of reasonable care to maintain the premises in a reasonably safe condition," which included "reasonable efforts to keep the premises free from transitory foreign objects or substances that might foreseeably give rise to loss, injury, or damage."  Fla. Stat. § 768.0710(1).  In a negligence action, the business invitee had the burden of proving that: (a) the business owner owed a duty to the invitee; (b) the business owner failed to exercise reasonable care in the maintenance, inspection, repair, warning, or mode of operation of

the business premises (actual or constructive knowledge of the transitory substance was not a required element of proof); and (c) the failure to exercise reasonable care was the legal cause of the injury.

On July 1, 2010, the Florida Legislature repealed Fla. Stat. § 768.0710 and replaced it with Fla. Stat. § 768.0755, entitled "Premises liability for transitory foreign substances in a business establishment."  This new statute is no longer limited to business invitees, but rather applies to "a person" who slips and falls on a transitory foreign substance in a business establishment and suffers injury.  The statute added a new element to the injured person's burden of proof – the injured person must now also prove that the business establishment "had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it."  Fla. Stat. § 768.0755(1).  See, e.g., Glaze v. Worley, 157 So.3d 552 (Fla 1st DCA 2015); Pembroke Lakes Mall Ltd. v. McGruder, 137 So. 3d 418, 416 (Fla. 4th DCA 2014); Kelso v. Big Lots Stores, Inc., 2010 WL 2889882 (M.D. Fla. July 21, 2010), Mills v. Target Corp., 2010 WL 4646701 (M.D. Fla. Nov. 9, 2010) (all holding that Fla. Stat. § 768.0755 is a substantive rule of law which creates a new element of proof in a premises liability negligence action).[4]  However, the statute "does not

---

[4]But see Kenz v. Miami Dade County, 116 So. 3d 461 (Fla. 3d DCA 2013) (holding that Fla. Stat. § 768.0755 is a procedural statute that does not create a new element of proof in a premises liability cause of action, but merely codifies a means and method by which a plaintiff shows that the defendant-business establishment has breached its duty of care) and Vallot v. Logan's Roadhouse, Inc., 567 Fed. Appx. 723 (11th Cir. 2014) (noting that the Florida Supreme Court has not yet decided whether Fla. Stat. § 768.0755 is a substantive or procedural rule of law).

affect any common-law duty of care owed by a person or entity in possession or control of a business premises." § 768.0755(2).

At trial, the Court held that the law of Florida with respect to determining a claimant's legal status in premises liability cases is now governed exclusively by Fla. Stat. § 768.075 (the trespasser statute) and Fla. Stat. § 768.0755 (the premises liability statute).  These two statutes, when read together, only discuss trespassers (both discovered and undiscovered) and invitees.  Uninvited licensees are nowhere mentioned.[5]  The Court's oral ruling was:

> [I]t seems to me, in my study of these two statutes, that the law of Florida with respect to persons who are on land or premises of another has been compressed, for lack of a better term, into and is governed by the terms of these two statutes.  And effectively the status of persons on someone else's premises has been reduced to two categories, or standings, rather than three. That is to say, it does not seem to me that there's anyplace in the law of Florida anymore for the concept or the term of a licensee.  You're either – if you're not the owner, you're either a trespasser or an invitee, the latter being governed with respect to business establishments by 768.0755.
>
> And one of the things that impels me to that result is the fact that 768.0755 is a statute, as I've already mentioned, passed as recently as 2010, which seems to me would trump any prior decisional law that would in any way be inconsistent with the provisions of that statute.

(Doc. 54, pp. 124-25).

---

[5]Fla. Stat. § 768.0755 refers to "a person" who is injured.  It is clear, however, when this statute is read together with § 768.075, that "person" refers to invitees to whom a business owner owes a legal duty and therefore the "injured person" must prove actual or constructive knowledge.

The Court further held that the provision in Fla. Stat. § 768.0755(2) that the statute "does not affect any common-law duty of care owed by a person or entity in possession or control of a business premises" had to be read in pari materia with the remaining portions of that statute as well as Fla. Stat. § 768.075 and, as such, applied to the duty of care afforded to business invitees and trespassers. (Doc. 54, pp. 129, 134). In other words, the Court concluded that the "uninvited licensee" category had been subsumed by these two statutes and no longer existed.

Steak N' Shake disagrees, arguing that two federal district court decisions interpreting Fla. Stat. § 768.0755 establish that the uninvited licensee legal status continues to exist. See Doc. 57, pp. 9-10 (citing Kelso v. Big Lots Stores, Inc., 2010 WL 2889882 (M.D. Fla. July 21, 2010), and Mills v. Target Corp., 2010 WL 4646701 (M.D. Fla. Nov. 9, 2010).  Neither of these unpublished decisions even mention the term uninvited licensee, and do not discuss in any way how Fla. Stat. § 768.0755 impacts this common law legal status.  Rather, both of these cases simply hold that Fla. Stat. § 768.0755 creates a new element of proof, and therefore is a substantive rule of law that cannot apply retroactively.  Moreover, the Court has been unable to locate any decisions from any state or federal court holding under Florida law, after the enactment of Fla. Stat. § 768.0755, that the "uninvited licensee" legal status remains viable.  Rather, the one decision that mentions "uninvited licensees" – Denniser v Columbia Hospital Corp of South Broward, 162 So. 3d

26 (Fla. 4th DCA 2014) – does not discuss Fla. Stat. § 768.0755, and uses the terms "uninvited licensee" and "trespasser" interchangeably.[6]

This entire discussion, while germane, can also be seen as an empty argument now that the evidence has been presented at trial.  This is so because the evidence presented to the jury was clearly sufficient to establish that Ms. Seaberg was in fact a business invitee.  Thus even if the uninvited licensee legal status still exists in Florida, it would not apply in this case.  Rather, the higher duty of care afforded business invitees applied (and Steak N' Shake does not argue that the jury erred in finding that it breached the duty of care owed to a business invitee).

A business invitee is "one who enters upon the premises of another for purposes connected with the business of the owner or occupant of the premises." Post, 261 So. 2d at 148.   And an ""invitation" exists when "the visitor entering the premises has an objectively reasonable belief that he or she has been invited or is otherwise welcome on that portion of the real property where injury occurs."  Fla. Stat. § 768.075(e)(a)1.  Ms Seaberg's presence in the Steak N' Shake store clearly met these definitional elements of the term "business invitee."

First, evidence was presented at trial that Heather Seaberg, Ms. Seaberg's daughter, was an employee of the Steak N' Shake store.  Heather's shift was ending, and her mother

---

[6]Steak N' Shake's argument is further weakened by its own words in its trial brief. See Doc. 39, p. 4 ("In other words, a discovered trespasser under [Fla. Stat. § 768.075] is essentially a common law uninvited licensee; a person whose presence is tolerated, but who is not invited to pursue those purposes for which such person enters.")

was on the premises to pick her up – *i.e.,* provide transportation to a Steak N' Shake employee.  The evidence also showed that Ms. Seaberg waited on a seating area platform of some kind just inside the restaurant's entryway; that Ms. Seaberg had waited in this same area for her daughter on numerous prior occasions; and that no one had ever told Ms. Seaberg that she could not wait for her daughter in that area.  The Court finds, as it did at trial, that these facts at least establish an implied invitation for Ms. Seaberg to be on the premises, and that her purpose for being there was "connected with the business of the owner or occupant of the premises."

Steak N' Shake argues that its business purpose is to sell food and nothing more; thus anyone who ventures onto its premises without the sole and express intent of purchasing food is either a trespasser or an uninvited licensee (or both) (Doc. 57, p. 13). This contention ignores the simple fact that in order to sell food, Steak N' Shake must have employees working at its premises.  And in order for its employees to work, they must be transported to and from the premises.  Moreover, if an employee were to remain on premises beyond normal working hours awaiting transportation, Steak N' Shake could potentially run afoul of applicable state and federal wage and hour laws, and/or employee safety laws and regulations. Thus, transporting an employee to and from work clearly is a purpose "connected with the business of the owner or occupant of the premises," and it is objectively reasonable for a person to believe that he or she is welcome on the premises

of a business where the person is picking up an employee at the end of a work shift.   To say otherwise simply defies common sense.[7]

Even more persuasive is the fact that while she was waiting for her daughter's work shift to end, Ms. Seaberg consumed a soda that was <u>purchased</u> from Steak N' Shake by her daughter.   Purchasing and consuming a soda or other food products by its customers is clearly a business purpose of Steak N' Shake.   The fact that Heather purchased the drink instead of Ms. Seaberg is of no moment.   To hold otherwise would mean that only paying customers are business invitees, and their accompanying guests who are consuming purchased food would be trespassers – an argument that is without any legal support.[8] <u>See</u> <u>Smith v. Montgomery Ward & Co.</u>, 232 So. 2d 195, 198-99 (Fla. 4th DCA 1970) (noting that persons who accompany a customer into a store may be business invitees, and holding that a person who ventures into a store to browse merchandise but does not

_____

[7]Neither side has submitted, and the Court has been unable to locate, any decisional authority applying Florida law to the question of whether transporting employees is a purpose connected with the business of the owner of the premises.

[8]At trial, counsel for Steak N' Shake appeared to agree with the Court that a guest of a paying customer who consumes food on its premises would also be a business invitee.  <u>See</u> Doc. 54, pp. 131-32.  Instead, Steak N' Shake argued that Ms. Seaberg's purpose for being on its premises was exclusively to pick up her daughter, and even though she later consumed a purchased drink, that did not change her purpose.  Putting aside for the moment that the Court has already held that transporting an employee is a business purpose and creates business invitee legal status, the Court is also unaware of any legal authority suggesting that a person's legal status is immutable.  Indeed, the applicable case law appears to suggest the contrary.  <u>See</u>, <u>e.g.</u>, <u>Denniser</u>, 162 So. 3d 26 (finding that a person who was a visitor at a hospital possessed the legal status of an invitee, but her legal status changed to that of trespasser when she ventured into another section of the hospital that was clearly designated for employees only).

make any purchases is also a business invitee; only persons who enter the premises on a personal errand or for their own advancement or interest are excluded).

In sum, the Court concludes that Ms. Seaberg was not merely a visitor entering a random property that was open to the public, and she was not there merely for her own benefit.  Rather, Ms. Seaberg was there to provide transportation to an employee (thereby assisting in the purposes of the business) and was also a customer consuming a soda purchased by her daughter.  This evidence is undisputed and establishes that Ms. Seaberg was a business invitee.  Steak N' Shake owed the highest duty of care to her while she was on premises.

Steak N' Shake's renewed motion for judgment as a matter of law will be denied as to the issues of Ms. Seaberg's legal status and the breach of Steak N' Shake's duty of care.

## The Motion for New Trial

Steak N' Shake asserts four grounds in support of its motion for new trial:  (1) that the jury verdict was against the manifest weight of the evidence; (2) that the Court's finding that an uninvited licensee legal status was no longer part of Florida law was prejudicial error; (3) that Ms. Seaberg's counsel introduced error during closing rebuttal argument; and (4) that the Court's refusal to instruct the jury on the affirmative defense of comparative negligence was a prejudicial error of law.

The first two arguments have been addressed in the Court's discussion of Steak N' Shake's motion for judgment as a matter of law and are rejected for the reasons set forth above.[9]  The Court will now focus on Steak N' Shake's remaining two arguments.

## I.    Standard of Review

A renewed motion for judgment as a matter of law may be joined, in the alternative, with a motion for a new trial under Federal Rule of Civil Procedure 59.  See Fed. R. Civ. P. 50(b).  The decision as to whether to grant a new trial is committed to the discretion of the trial judge.  Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001).

Rule 59(a)(1) provides that after a jury trial a new trial may be granted to all or any of the parties on all or part of the issues "for any of the reasons for which a new trial has heretofore been granted in an action at law in federal court."  The Supreme Court has explained that a motion for new trial may be granted if based on a claim that:  (1) "the verdict is against the weight of the evidence;" (2) "the damages are excessive, or that, for other reasons, the trial was not fair to the party moving;" or (3) "raise[s] questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions

---

[9]Steak N' Shake mistakenly argues that the Court expressly acknowledged that a issue of fact existed as to Ms. Seaberg's legal status, and that by not permitting this issue of fact to be decided by the jury, the Court committed prejudicial error (Doc. 57, p. 18).  The Court said nothing of the sort.  Rather, the Court ruled that Ms. Seaberg was a business invitee (Doc. 54, pp. 134-35).  The Court did find an issue of fact with respect to Steak N' Shake's notice and accordingly directed that question to the jury.  See Verdict, Doc. 48, Interrogatory No. 1.

to the jury." Montgomery Ward & Co. v. Duncan, 311 U. S. 243, 251, 61 S.Ct. 189, 194 (1940).

The Court may grant a motion for a new trial under Rule 59 if it believes the verdict rendered by the jury was contrary to the great-and not merely the greater-weight of the evidence. Williams v. City of Valdosta, 689 F.2d 964, 973 (11th Cir. 1982). To make this determination, the Court must independently weigh the evidence favoring the jury verdict against the evidence in favor of the moving party. Id. (citing Rabun v. Kimberly–Clark Corp., 678 F.2d 1053, 1060 (11th Cir. 1982)). The Court should not substitute its own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury. Williams, 689 F.2d at 973, n. 7. In cases involving simple issues, highly disputed facts, and an absence of "pernicious occurrences," the Court has less freedom to disturb a jury verdict than it does in cases involving complex issues, facts not highly disputed, and events arguably marred by error. Id. (citing, among others, Conway v. Chemical Leaman Tank Lines, Inc., 610 F.2d 360, 362 (5th Cir. 1980)).

## II.   The Plaintiff's Rebuttal Argument to the Jury

Steak N' Shake contends that it was denied a fair trial because Ms. Seaberg's counsel made two arguments during the rebuttal portion of his closing argument: (1) comments about the failure of Steak N' Shake to call as a witness the server shown in the surveillance video who dropped the souffle cup; and (2) comments that it was the "usual testimony" of Steak N' Shake's expert witness that the plaintiff suffered no injuries.

### A.    Argument Regarding the Missing Server

The server who dropped the souffle cup in the surveillance video shown to the jury did not testify at trial.  During closing argument, counsel for Steak N' Shake first referenced the video in detail, stating, in part:

> What you do see in that video is you see the server coming around that station, and what causes her to turn around is the cup dropping.  I think what you see is you hear – she hears the cup drop, she turns around, she picks it up.  It's a cup coming from a table that – they're dirty dishes.  So as she's rounding the corner and she drops that cup, she turns around, she picks it up. If it's empty to her, the question is is it reasonable for her to pick it up and go on.

(Doc. 55, p. 32).

In response to this argument, Ms. Seaberg's attorney in his rebuttal stated the following:

> Where's the testimony from the lady that dropped the souffle cup?  If nothing came out of that souffle cup, why didn't you hear about that?  Why was there so much confusion and so much discussion over who even dropped the souffle cup?  Why were you originally led to believe that Deborah [Ms. Cole] was the one that was on video dropping the souffle cup?
>
> The only souffle cup that Ms. Seaberg ever saw – we want to talk about notice and we want to talk about her being blamed for the fall, which is what defense counsel just did, was that she saw Deborah spill what she spilled in a different area of the restaurant, in an area of the restaurant she never walked through.  She never saw the girl that was on video drop the souffle cup because she was talking to her daughter.
>
>                                  * * * *
>
> No evidence that there was anything in the cup at the time.  Well, common sense inferences.  Again, if there's nothing in the cup and nothing came out, where is she?  Why did she not tell us that?  Where is the accident

report?  Where are those things, those things that they have exclusive control over?

Common sense tells you that something comes out of the cup.  In fact, you heard from two different employees.  You heard from Deborah and you heard from Heather that they've never dropped a souffle cup and stuff not come out.  So there's actual knowledge.  She dropped the cup and stuff came out.  You got to ask yourself is it more likely that nothing came out or more likely that something came out.  Same question.  Two Steak N' Shake employees that did testify testified they've never dropped one and something not come out.  Where was the lady that dropped the souffle cup?

(Doc. 55, pp. 47-49).

Steak N' Shake did not contemporaneously object to any of these statements. Rather, Steak N' Shake waited not only until completion of summations, but also until after the jury had been instructed, and then asked for a curative instruction (Doc. 55, pp. 63-64). The Court noted the objection, but did not take further action, stating that "I don't think there's any rule with which I'm aware that prohibits – at least in this court – prohibits argument with respect to inferences to be drawn from absent witnesses where it is shown that the absence of the witness would be caused by a party, that party is in some peculiar control over the witness in some way."  (Id., p. 64).[10]

Steak N' Shake now contends that Ms. Seaberg's attorney's comments were highly prejudicial, constituted an attempt by Plaintiff's counsel to give his opinion as to what the

---

[10]In fact, it is the law of this Circuit that "[w]hen a witness is peculiarly within the control of one party, and the witness' testimony would elucidate facts in issue, an instruction is appropriate regarding the permissible inference which the jury may draw from the party's failure to call the witness." United States v. Nahoom, 791 F.2d 841, 846 (11th Cir. 1986) (citing United States v. Chapman, 435 F.2d 1245, 1247 (5th Cir. 1970)).

missing witness would have testified to, and were improper because the Parties previously stipulated to their exclusion.  The Court disagrees.

"A district court has wide discretion to regulate the scope of argument.  For reversible error to be found in closing argument, the challenged argument must be plainly unwarranted and clearly injurious." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1282 (11th Cir. 2008) (citing Commercial Credit Equip. Corp., 549 F.2d 979, 981 (5th Cir. 1977)).   The Court finds that Ms. Seaberg's attorney's comments were not "plainly unwarranted and clearly injurious," nor did they impair the jury's ability to render its verdict or impact the interests of substantial justice.

Steak N' Shake also seeks to rely on Ms. Seaberg's own pretrial motion in limine as proof that the rebuttal argument was inappropriate.  Ms. Seaberg moved to have Steak N' Shake barred from mentioning at trial, among other things, "[a]ny challenge to opposing counsel to tell the jury why certain witnesses did not testify, or any reference to what uncalled witnesses would have testified to if called." (Doc. 12, p. 2).  Steak N' Shake did not have any "current objections" to this portion of Ms. Seaberg's motion, but reserved the right to object to singular issues, if necessary (Doc. 13).  The Court reserved ruling on this and all other motions in limine, (Doc. 35), and did not dispose of the motions in limine before or during trial.  Motions not granted are deemed to be denied, and no party even mentioned this portion of Ms. Seaberg's motion in limine until counsel completed his

rebuttal argument,[11] or raised any concerns about enforcement of the motion until the present motion for new trial.  To say the Parties agreed that comments about absent witnesses would be out of bounds simply says too much.

## B.   Argument Regarding Steak N' Shake's Expert Witness

At trial, Steak N' Shake called its expert witness, Dr. Troy Lowell, to testify.  During his testimony, Dr. Lowell stated that he testifies as an expert witness "in maybe five or six trials a year," and that "it's always for the defense."  (Doc. 54, p. 17).  Dr. Lowell further testified that "in about 10 percent of the examinations I do, I do conclude that a significant permanent injury has occurred."  (Id., p. 19).  He also testified on cross-examination that he performs about 50 to 75 medical examinations each year as a defense expert, and that "90 percent of the time I don't find an injury, that's correct."  (Id., p. 43).  Lastly, he admitted that he has been paid over $700,000 over the last four years to testify on behalf of defendants (Id., p. 67).

During closing arguments, counsel for Steak N' Shake attempted to discredit Ms. Seaberg's expert witness, Dr. Cannon, by emphasizing his financial interest in the outcome of the case: "If she gets paid, he gets paid.  If she doesn't, he doesn't."  (Doc. 55, pp. 41-42).  Counsel then argued that Ms. Seaberg's expert had a "far greater economic interest in this case than Dr. Lowell," who "testified that he gets paid regardless of the opinion he gives."  (Id., p. 42).

---

[11]And at that time, Ms. Seaberg's counsel noted that the motions in limine had not been ruled on, and Steak N' Shake did not request any ruling.  (Doc. 55, p. 64).

In response, Ms. Seaberg's counsel stated during final rebuttal:

> Dr. Cannon [Ms. Seaberg's witness] has a stake in this because he might get paid or he gets paid if you recovery [sic]; he doesn't get paid if you don't. That's a $13,000 stake. His bill's $13,000. Dr. Lowell's got a $700,000-every-four-year stake in this.  What do you think would happen if he started formulating reasonable opinions and started finding that people are injured in accidents.?

(Doc. 55, p. 53).

Steak N. Shake objected to these comments, which the Court overruled, finding that "it's a matter of argument . . . with respect to the frequency of the opinions that were offered by the doctor."  (Doc. 55, p. 53).

As the Court found at trial, this rebuttal argument was neither "plainly unwarranted and clearly injurious," nor did it impact the jury's ability to render a verdict or impair any interests of substantial justice.  It was not a discussion of Dr. Lowell's "usual testimony," but rather was a direct counter-response to Steak N' Shake's attempts to discredit Ms. Seaberg's expert witness based on his financial interests in the case.  It was also fully supported by Dr. Lowell's own testimony.[12]

Steak N' Shake's motion for new trial will be denied as to the issue of improper closing arguments.

---

[12]Steak N' Shake also argues that such arguments were ruled inadmissible, again pointing to Ms. Seaberg's own motion in limine.  This argument fails for the same reasons discussed above.

### III.   Comparative Negligence Instruction

Steak N' Shake's final argument in favor of a new trial focuses on this Court's refusal to instruct the jury on the defense of comparative negligence.

Contributory and comparative negligence are affirmative defenses that must be properly pleaded in order to be preserved. See Fed. R. Civ. P. 8(c)(1), 12(b); Florida Patient's Comp. Fund v. Tillman, 487 So. 2d 1032, 1035 (Fla. 1986); Harvey v. Home Depot U.S.A., Inc., 2005 WL 1421170 at * 2 (M.D. Fla. June 17, 2005); Fla. Stat. § 768.81. See also Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1239 (11th Cir. 2010) ("Failure to plead an affirmative defense generally results in a waiver of that defense."). Steak N' Shake never raised the comparative negligence defense; the company never asserted in its answer, amended answer, joint pretrial statement, or by way of requested jury instructions that Ms. Seaberg's injuries were caused, in whole or in part, by her own actions and/or negligence. See Docs. 4, 26, 32. Rather, Steak N' Shake stated that it had no objections to the jury instructions prepared by the Court which did not include any defense of comparative negligence. (Doc. 54, p. 140). It was only on the morning of the third day of trial, after the charge conference and just before counsel was scheduled to make argument before the jury, that Steak N' Shake first mentioned the term "comparative negligence" and/or "comparative fault." (Doc. 55, pp. 5-6).

Steak N' Shake argues that it did affirmatively plead the defense of comparative negligence when it asserted in its answer and amended answer that "[t]he alleged

dangerous condition to which Plaintiff attributes her injury was open and obvious to Plaintiff due to her ability to see the condition immediately prior to and as it existed at the time of her injury and about which she had equal and/or superior knowledge of the foreign substance at issue." (Doc. 4, ¶ K; Doc. 26, ¶ K).   Steak N. Shake also points to the joint pretrial statement where it claimed that "to the extent that a dangerous condition existed, it existed in a different area of the premises, and Seaberg was on notice of that condition because SNS representatives verbally and visually warned of Seaberg of the area where the condition existed." (Doc. 32, p. 2) (emphasis supplied).   Lastly, Steak N' Shake contends that Ms. Seaberg was aware of the comparative negligence defense when it listed in the joint pretrial statement as an issue of fact that remain to be litigated "[w]hether Karen Seaberg was on notice of a transitory substance." (Doc. 32, p. 4).

None of this rises to the level of a cognizable assertion of comparative negligence as an affirmative defense.  Furthermore, to the extent that Steak N' Shake makes reference to its answer and amended answer it ignores the rules of this Court and the law of the case.  In this District, pursuant to Fed. R. Civ. P. 16(d) and (e) great emphasis is placed upon the importance of the pretrial statement prepared by counsel in advance of a final pretrial conference.  Under the explicit provisions of Middle District of Florida Local Rule 3.06(e):

> All pleadings filed by any party prior to filing of the pretrial statement shall be deemed to be merged therein, or in any subsequent pretrial order entered by the Court.  The pretrial statement and the pretrial order, if any, will control the course of the trial and may not be amended except by order of the Court in the furtherance of justice.  If new evidence or witnesses are discovered after

filing of the pretrial statement, the party desiring to use the same shall immediately notify opposing counsel and the Court, and such use shall be permitted only by order of the Court in the furtherance of justice.

Thus, while the issue pleadings may be referred to when necessary to interpret the pretrial statement, it is the pretrial statement that controls and the importance of this operation of the Local Rules is stressed to counsel as a matter of routine by the judges of this Court during the final pretrial conference.  Accordingly, the pretrial order entered by the Court after the final pretrial conference – as in this case – explicitly states "[t]he Joint Pretrial Statement (Doc. 32) is ADOPTED AND CONFIRMED, will control the course of the trial, and may not be further amended except by order of this Court pursuant to Rule 3.06 of the Local Rules of the Middle District of Florida." (Doc. 35, ¶ 1).  Here, the pretrial statement simply does not mention comparative negligence or comparative fault, and that is the end of it.

Steak N' Shake also argues – again without any legal support – that the affirmative defense of comparative negligence was tried to the jury by the Parties' express or implied consent.  See Fed. R. Civ. P. 15(b)(2).  This did not happen.  Ms. Seaberg at no time consented to the presentation of the affirmative defense of comparative negligence to the jury.  In fact, when Steak N' Shake raised the defense for the first time immediately prior to the commencement of closing arguments, after the jury instructions had been finalized, Ms. Seaberg's counsel objected, arguing that Steak N' Shake had never previously raised the defense (Doc. 55, pp. 5-7).  The Court agreed, noting that Steak N' Shake did not preserve this defense in its joint pretrial statement (Id., pp. 6-7).

Steak N' Shake's motion for new trial will be denied as to the refusal to give an instruction on the affirmative defense of comparative negligence.

### The Motion for Remittitur of Damages

"Remittitur" is the procedural process by which an excessive verdict of the jury is reduced. Moses v. K-Mart Corp., 905 F. Supp. 1054, 1057 (S.D. Fla. 1995) (citations omitted). It is well understood that a "jury's verdict should not be disturbed if there is competent evidence in the record to support it." Deakle v. John E. Graham & Sons, 756 F. 2d 821, 827 (11th Cir. 1985). When considering a motion for remittitur, the standard for determining the appropriateness of the award is whether it "exceeds the amount established by the evidence." Goldstein v. Manhattan Industries, Inc., 758 F. 2d 1435, 1448 (1985).

The jury awarded Ms. Seaberg $375,000 for past and future medical and hospital expenses, and $50,000 for past and future pain and suffering (Doc. 48). Steak N' Shake contends that the award of $375,000 for medical expenses is excessive, and is not supported by the evidence presented at trial. According to Steak N' Shake, Ms. Seaberg's past medical expenses were $139,204, and the cost of her surgery was $83,056, the estimate for two additional future surgeries was $100,000, and the estimate for future doctor's visits and surgeon's fees for both surgeries was $27,250. This equates to total medical expenses of $349,510. Steak N' Shake further argues that this amount should be

reduced by $29,069, the amount of the self-pay adjustment, which would reduce the total of medical expenses to $320,441.

A review of the trial record demonstrates that Steak N' Shake was correct that Ms. Seaberg's past medical expenses equated to $139,204 (Plaintiff's Trial Exh. K, Doc. 55, p. 21). Ms. Seaberg's expert witness, Dr. Cannon, testified that Ms. Seaberg would require two additional future knee replacement surgeries, and that each surgery would cost approximately $10,000 more than the original procedure (Doc. 54, pp. 100-102). Based on this evidence, at closing argument, Ms. Seaberg's counsel argued to the jury that she would require two further knee surgeries, and that the cost of those two surgeries combined would equate to approximately $118,000 each (Doc. 55, p. 24).[13]  This amount was calculated as follows: for each surgery, there would be a $13,625.42 surgeon's bill, $83,000 for the hospital, $1,785 for the anesthesiologist, $10,000 for rehabilitation, and an additional $10,000 for the increased difficulty of the future procedures (Id., pp. 24-25). Ms. Seaberg's counsel acknowledged that the second surgery would cost more than $118,000, but asked the jury to award the $118,000 as an appropriate estimate (Id., p. 26). Counsel then asked the jury to award a total of $375,000 for medical expenses, past and future ($139,000 for past expenses, $118,000 for the first future surgery, and $118,000 for the second future surgery). This is precisely what the jury awarded. Therefore, the Court

---

[13]Counsel acknowledged that the $139,204 in medical expenses included the costs of other procedures not related to knee replacement surgery, and therefore adjusted the future medical expenses request to only include expenses for knee replacement operations.

cannot say that the damages awarded for past and future medical expenses were excessive and/or unsupported by the evidence.

Steak N' Shake also requests that the award of past and future medical expenses be reduced to reflect the self-pay adjustment of $29,069.  The Parties agreed at trial that Ms. Seaberg's medical bills reflected the total she was charged, and that there was a difference between what was charged and what Ms. Seaberg actually did or will pay, although the amount that Ms. Seaberg did or will pay was not disclosed.  The Parties further agreed that "to the extent a setoff is applicable, the court can take care of that after the decision by the jury, if necessary."  (Doc. 54, p. 142-43).

In its present motion, Steak N' Shake has not presented any evidence that Ms. Seaberg actually availed herself of the self-pay adjustment, *i.e.*, that her hospital bills have actually been reduced by that amount, nor has Steak N' Shake established that this self-pay adjustment is an appropriate collateral source subject to setoff.  Accordingly, this portion of Steak N' Shake's request for a remittitur will be denied without prejudice, and Steak N' Shake will be given an opportunity to file a separate motion on the purported reduction of the judgment based on a setoff.

### Conclusion

Accordingly, upon due consideration, it is ORDERED as follows:

(1)    Defendant Steak N' Shake's Renewed Motion for Judgment as a Matter of Law or, Alternatively, for New Trial, or Alternatively for Remittitur (Doc. 57) is DENIED

WITHOUT PREJUDICE with respect to the request to reduce the award of past and future medical expenses by a setoff for a self-pay adjustment.  In all other respects, the motion is DENIED.

(2)     Within **twenty (20) days** from the date of this Order, Defendant Steak N' Shake may file a properly supported motion for setoff of the award of past and future medical expenses due to a self-pay adjustment.  Plaintiff Karen Seaberg may file a response within **twenty (20) days** from the date that any such motion is filed.

(3)     Defendant Steak N' Shake's Motion to Stay and for Protective Order (Doc. 60) is DENIED AS MOOT.  Within **twenty (20) days** from the date of this Order, Steak N' Shake shall file its response, if any, to Plaintiff Karen Seaberg's Verified Motion for Costs (Doc. 58) and Motion to Join or Add Zurich American Insurance Company as Party Defendant on the Final Judgment (Doc. 59).

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 30th day of December, 2015.


_____
**UNITED STATES DISTRICT JUDGE**


Copies to:   Counsel of Record
              Mari Jo Taylor